Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Michael Isaac Miller (SBN 266459)
imiller@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:   (818) 986-9698

*Additional Counsel Identified Below*

Attorneys for Plaintiff
MARY LOU VEGA, individually, and on
behalf of other members of the public
similarly situated

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| MARY LOU VEGA, individually, and on behalf of other members of the public similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>OCWEN FINANCIAL CORPORATION, a Florida corporation, and OCWEN LOAN SERVICING, LLC, a Delaware limited liability company,<br><br>Defendants. | Case Number:<br>**CLASS ACTION COMPLAINT FOR:**<br>(1)  Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*);<br>(2)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c));<br>(3)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d));<br>(4)  Violations of the Rosenthal fair Debt Collection Practices Act (Cal. Civ. Code §§ 1788, *et seq.*);<br>(5)  Unjust Enrichment**;** and<br>(6)  Fraud<br>**Jury Trial Demanded** |

For her complaint against Ocwen Financial Corporation and Ocwen Loan Servicing, LLC (collectively "Ocwen" or "Defendants"), Plaintiff Mary Lou Vega ("Plaintiff"), individually, and on behalf of all other members of the public similarly situated, based on information and belief, alleges as follows:

## NATURE OF THE ACTION

1.      This case concerns fraudulent practices committed by Ocwen in connection with its home mortgage loan servicing business.  Taking advantage of the economic downturn and the increasing number of loans in default, Ocwen services loans according to uniform practices designed to maximize fees assessed on borrowers' accounts when they are behind on their payments.

2.      More specifically, when home mortgage borrowers get behind on their payments and go into "default," Ocwen assesses fees on borrowers' accounts for default-related services, including property inspections, which are performed by third parties, and are purportedly designed to protect the lender's interest in the property.  Ocwen, however, is not permitted to indiscriminately assess borrowers' accounts for unnecessary property inspections.  Nevertheless, as discussed in detail below, that is precisely what Ocwen does.

3.      Utilizing an enterprise of affiliated companies, including Altisource Portfolio Solutions S.A. ("Altisource") -- a wholly-owned subsidiary of Ocwen until 2009, when it was spun-off into a separate company -- and third party "property preservation" vendors, Ocwen engaged in a scheme to indiscriminately assess on borrowers' accounts fees for unnecessary property inspections, cheating borrowers who can least afford it.  Employing this strategy, Ocwen has been able to avoid absorbing the costs of these default-related service fees at the expense of struggling consumers.

4.      Many borrowers reasonably believe the lender from whom they obtained their mortgage will hold and service their loan until it is paid off.  Instead, however, through relatively recent mortgage industry practices, such as securitization and the sale of mortgage backed securities, that is often not the case.

5.      In today's market, loans and the rights to service them are bought and sold at will, multiple times over, and the securitization process has transformed the way financial services companies generate profits from mortgage loans.  For example, Ocwen explains in its Form 10-K statement:

> We provide residential and commercial mortgage loan servicing, special servicing, and asset management services.  We earn fees for providing these services to owners of the mortgage loans and foreclosed real estate.  In most cases, we provide these services either because we purchased the [mortgage servicing rights ("MSRs")] from the owner of the mortgage, retained the MSRs on the sale of residential mortgage loans or because we entered into a subservicing or special servicing agreement with the entity that owns the MSRs. . . . Servicing involves the collection and remittance of principal and interest payments received from borrowers, the administration of mortgage escrow accounts, the collection of insurance claims, the management of loans that are delinquent or in foreclosure or bankruptcy, including making servicing advances, evaluating loans for modification and other loss mitigation activities and, if necessary, foreclosure referrals and the sale of the underlying mortgaged property following foreclosure (real estate owned or REO) on behalf of investors or other servicers.[1]

6.      Elaborating on the tremendous growth in its servicing business in recent years, Ocwen states:

> Our residential servicing portfolio has grown from 351,595 residential loans with an aggregate [unpaid principal balance ("UPB")] of $50.0 billion at December 31, 2009, to 2,861,918 residential loans with an aggregate UPB of $464.7 billion at December 31, 2013. Through acquisitions, we have substantially increased the share of our servicing portfolio that is made up of conventional (loans conforming to the underwriting standards of the government sponsored entities, the Federal National Mortgage Association (Fannie Mae) or the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the GSEs and Agency), government insured (loans insured by the Federal Housing Authority (FHA) of the Department of Housing and Urban Development (HUD) or Department of Veterans Affairs (VA) (collectively, government insured)) and prime non-Agency

---

[1] Ocwen Financial Corp, SEC FORM 10-K (Period Ending Dec. 31, 2013), available at http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm (last visited April 1, 2014).

loans (loans generally conforming to the underwriting standards of the GSEs whose UPB exceeds the GSE loan limits, commonly referred to as jumbo loans). At December 31, 2013, these loans comprise 56.8% of the UPB of our servicing portfolio, up from 24.4% at December 31, 2012.[2]

7.     Ocwen goes on to explain that "[t]he mortgaged properties securing the residential loans that [it] service[s] are geographically dispersed throughout all 50 states, the District of Columbia and two U.S. territories," with the five largest concentrations of properties, comprising approximately 39% of the loans serviced at December 31, 2013, located in California, Florida, New York, Texas and New Jersey.[3]  California has the largest concentration with 436,374 loans or 15% of the total.[4]

8.     Borrowers depend on their mortgage servicers to handle servicing-related tasks both accurately, and with skill.  But, because Ocwen does not profit directly from interest payments made by borrowers, rather than ensuring that borrowers stay current on their loans, Ocwen is more concerned with generating revenue from fees assessed against the mortgage accounts they service and from the lenders and/or investors for whom they service loans.  According to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [who owns the loan] money, but [it] may actually earn money for the servicer in the form of fees."[5]

9.     Ocwen sees opportunity where investors see failure because borrowers are captives to companies who service their loans.  Accordingly, when borrowers go into default, and Ocwen unilaterally decides to instruct third parties to perform property inspections, borrowers have no option but to accept Ocwen's established procedures

---

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

concerning the frequency and manner in which they are ordered and conducted, as well as Ocwen's choice of providers.

10.     Taking advantage of these circumstances, Ocwen formed an enterprise of affiliated companies, including Altisource, and third party "property preservation" vendors, and then, developed a uniform practice of unlawfully indiscriminately and routinely ordering, conducting, and assessing borrowers' accounts for default-related services that are unnecessary and assessing fees against borrowers' accounts rather than against the accounts of the lenders and/or investors for whom they service these accounts or absorbing the costs themselves.

11.     Ocwen's practices are designed to avoid detection even when examined in bankruptcy proceedings.  As one court has explained, "[l]enders have apparently been operating under the assumption that the fees and costs in their proofs of claim are invulnerable to challenge because debtors lack the sophistication, the debtors' bar lacks the financial motivation, and bankruptcy courts lack the time."[6]  "[T]he Court believes that certain members of the mortgage industry are *intentionally* attempting to game the system by requesting undocumented and potentially excessive fees."[7]

12.     This type of rampant abuse by mortgage servicers has led federal regulators to enter into numerous consent orders, but according to Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation:[8]

---

[6] *In re: Prevo*, 394 B.R. 847, 848 (Bankr. S.D. Tex. 2008).

[7] *Id*. at 851 (emphasis added).

[8] *See* Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation, *Mortgage Servicing:  An Examination of the Role of Federal Regulators in Settlement Negotiations and the Future of Mortgage Servicing Standards*, before the Subcommittees on Financial Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services, U.S. House of Representatives, July 7, 2011, available at http://financialservices.house.gov/UploadedFiles/070711pearce.pdf (last visited, Feb. 1, 2012).

CLASS ACTION COMPLAINT

these consent orders do not fully identify and remedy past errors in mortgage-servicing operations of large institutions; in fact, the scope of the interagency review did not include a review of . . . the fees charged in the servicing process.  Much work remains to identify and correct past errors and to ensure that the servicing process functions effectively, efficiently, and fairly going forward.

And, moreover, the consent orders do not reach the type of conduct at issue here.

13.     Plaintiff brings this action, seeking injunctive relief and damages on behalf of herself and the thousands of other borrowers who have been victimized by Ocwen's uniform scheme.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Ocwen.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Ocwen is a citizen.

15.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964.  This Court has personal jurisdiction over Ocwen under 18 U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

16.     Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) and (c)(2) because Ocwen's contacts are sufficient to subject them to personal jurisdiction in this District, and therefore, Ocwen resides in this District for purposes of venue, or under 28 U.S.C. § 1391(b)(2) because certain acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District.

**PARTIES**

17.     Plaintiff Mary Lou Vega is an individual and a citizen of California.

18.     Defendant Ocwen Financial Corporation is a corporation organized under the laws of Florida, with its principal place of business in Atlanta, Georgia.

19.     Defendant Ocwen Loan Servicing, LLC is Delaware limited liability company, and an indirect wholly-owned subsidiary of Ocwen Financial Corporation. Ocwen Loan Servicing, LLC maintains operations in this District related to the activities at issue in this case, including operations concerning the management of loans that are in default, which are conducted from offices located in Burbank, California.  Ocwen Loan Servicing, LLC's headquarters are located in West Palm Beach, Florida.  It is licensed to service mortgage loans in all fifty states, including California, the District of Columbia, and two U.S. territories.

20.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

21.     Plaintiff is informed and believes, and based thereon, alleges that, at all material times herein, each of the Defendants was the agent, servant, or employee of the other Defendants, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Defendants, and ratified and approved the acts of the other Defendants..

22.     Defendants are the ultimate recipient of the ill-gotten gains described herein. The fraudulent scheme at issue in this case was organized by executives working at the highest levels of Defendants' respective companies, and carried out by both executives and subordinate employees working for Defendants.

**FACTUAL BACKGROUND**

23.    America's lending industry is in turmoil, and the lending community has divorced itself from the borrowers it once served.  Traditionally, when people wanted to borrow money, they went to a bank or a "savings and loan."  Banks loaned money and borrowers promised to repay the bank, with interest, over a specific period of time.  The originating bank kept the loan on its balance sheet, and serviced the loan -- processing payments, and sending out applicable notices and other information -- until the loan was repaid.  The originating bank had a financial interest in ensuring that the borrower was able to repay the loan.

24.    Today, however, the process has changed.  Mortgages are now packaged, bundled, and sold to investors on Wall Street through what is referred to in the financial industry as mortgage backed securities or MBS.  This process is called securitization.  Securitization of mortgage loans provides financial institutions with the benefit of immediately being able to recover the amounts loaned.  Securitization essentially eliminates the financial institution's risk from potential default.  But, by eliminating the risk of default, mortgage backed securities have disassociated the lending community from borrowers.  Numerous unexpected consequences have resulted from the divide between lenders and borrowers.

25.    Among other things, securitization has led to the development of an industry of companies which make money primarily through servicing mortgages for the hedge funds and investment houses who own the loans.  Rather than earn income from the interest on these loans, these companies are paid a fee for their loan administration services.  Servicing fees are usually earned as a percentage of the unpaid principal amount of the mortgages that are being serviced, and a typical servicing fee is approximately 0.50% per year.

26.    Additionally, under agreements with investors (pooling and service agreements a/k/a PSAs), loan servicers assess fees on borrowers' accounts for default-related services in connection with their administration of borrowers' loans.  These fees

include Broker's Price Opinion fees, appraisal fees, and property inspection fees. Ocwen's collection of these unnecessary fees, however, exemplifies how America's lending industry has run off the rails.

27.     As one Member of the Board of Governors of the Federal Reserve System has explained:[9]

> While an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at best.  The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor . . . The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse.

28.     Seeking to capitalize on these circumstances, which are subject to an enormous potential for abuse, Ocwen has positioned itself as a major player in the residential mortgage servicing industry.  As larger banks have shifted their attention to servicing the mortgage loans of their core customers -- *i.e.*, prime loan borrowers that use the banks' other services -- Ocwen has focused on servicing loans obtained by non-prime, or credit impaired, borrowers.

29.     This has allowed Ocwen to grow at a tremendous rate over the past four years, increasing its residential servicing portfolio from 351,595 residential loans with an aggregate UPB of $50.0 billion at December 31, 2009, to 2,861,918 residential loans with an aggregate UPB of $464.7 billion at December 31, 2013.

---

[9] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

30.     Ocwen's rapid growth has caught the attention of regulators, including Benjamin Lawsky, Superintendent of New York's Department of Financial Services.  As a result of a consent order entered into by Lawsky's office and Ocwen in late 2012, a compliance monitor was installed at Ocwen in 2013.[10]  Additionally, on or around February 6, 2014, Lawsky halted indefinitely Wells Fargo's transfer of approximately $39 billion in servicing rights to Ocwen.[11]

31.     Speaking at the annual meeting of the New York Bankers Association in February 2014, Lawsky cautioned that Ocwen's explosive growth "raises red flags," that he sees "corners being cut" by non-bank servicers like Ocwen, and that Ocwen's use of technology to handle distressed loans is "too good to be true."[12]

32.     Such concerns about Ocwen's loan servicing practices are well-founded.  For companies like Ocwen, who are determined to maximize the money they earn from servicing loans, the right to charge third-party fees has opened the door to a world of exploitation.  As a result of the disassociation between loan servicers and the monies generated from the interest borrowers pay on their loans, Ocwen has been incentivized to find other ways to grow their profits.

33.     Ocwen, through affiliated companies, such as Altisource, and third party "property preservation" vendors, formed an unlawful enterprise and decided to game the system.

---

[10] Michael Corkery, *State Regulator Halts Deal Between Wells Fargo and Loan Servicer*, N.Y. Times, February 6, 2014, available at http://dealbook.nytimes.com/2014/02/06/new-york-regulator-halts-mortgage-servicing-rights-deal/?_php=true&_type=blogs&_r=0.

[11] *Id.*

[12] Kate Berry, *Lawsky Bashes Ocwen, Says Servicer's Growth 'Raises Red Flags,'* National Mortgage News, February 12, 2014, available at http://www.nationalmortgagenews.com/mortgage-servicing/lawsky-bashes-ocwen-says-servicers-growth-raises-red-flags-1041092-1.html?zkPrintable=true.

CLASS ACTION COMPLAINT

34.     In short, as explained by Adam J. Levitin, Associate Professor of Law at the Georgetown University Law Center, in testimony to the United States House Financial Services Committee, Subcommittee on Housing and Community Opportunity, "Servicers' business model also encourages them to cut costs wherever possible, even if this involves cutting corners on legal requirements, and to lard [sic] on junk fees and in-sourced expenses at inflated prices."[13]

### OCWEN'S AUTOMATED LOAN SERVICING PRACTICES

35.     Ocwen assigns the complex task of administering the millions of loans it services to computer software programs.  The software programs are designed to manage borrowers' accounts and assess fees, according to protocols and policies designed by the executives at Ocwen.

36.     Prior to August 2009, Ocwen's technology platforms were provided by Ocwen Solutions, which consisted primarily of Ocwen's former unsecured collections and residential fee-based loan processing businesses. Ocwen Solutions provided technological services across the full spectrum of the mortgage lifecycle, from due diligence and underwriting to default processing and property preservation, all the way up to collections and customer relationship management.  Ocwen developed this technology platform over a period of more than 20 years at a cost of more than $150 million.[14]

37.     In order to allow Ocwen to focus on growing its core servicing business, on August 10, 2009, Ocwen completed the distribution of Ocwen Solutions via the spin-off of Altisource.[15]  As part of the separation, William C. Erbey -- Ocwen's Chairman of the

---

[13] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing*, before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010, available at http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf (last visited Feb. 1, 2012).

[14] Ocwen Financial Corp, SEC FORM 10-K (Period Ending Dec. 31, 2012), available at http://www.sec.gov/Archives/edgar/data/873860/000101905613000314/ocn_10k12a.htm (last visited Sept. 9, 2013).

[15] Altisource was originally incorporated on November 4, 1999 in Luxembourg as Ocwen

Board and the owner of 13% of Ocwen's common stock -- also became the Chairman of the Board for Altisource.[16]

38.     Mr. Erbey currently owns approximately 23% of the common stock of Altisource, and has taken a very active role in the company.  As Altisource explains in its Form 10-K Statement, its success is "dependent" upon Mr. Erbey's services, and the loss of his services "could have a material adverse effect upon business, operating results and financial conditions."[17]

39.     Although Ocwen and Altisource are separate entities, they are effectively joined together, as affiliated companies, operating as a continuing unit with a common purpose.

40.     In fact, Ocwen and Altisource are so interconnected, that Altisource points to its relationship with Ocwen as a potential "risk factor" to its business:[18]

> Given this close and continuing relationship with Ocwen, we may encounter difficulties in obtaining and retaining other customers who compete with Ocwen.  Should these and other potential customers continue to view Altisource as part of Ocwen or as too closely related to or dependent upon Ocwen, they may be unwilling to utilize [Altisource's] services, and [Altisource's] growth could be inhibited as a result.

---

Luxembourg S.à r.l.  *See* Altisource Portfolio Solutions S.A., SEC FORM 10-K (Period Ending Dec. 31, 2012), available at http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm (last visited Sept. 9, 2013). The entity was renamed Altisource Portfolio Solutions S.à r.l. on May 12, 2009, and converted into Altisource on June 5, 2009.  *Id.*  Prior to August 10, 2009, Altisource was a wholly-owned subsidiary of Ocwen. *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

CLASS ACTION COMPLAINT

41.    This "close and continuing relationship" between Ocwen and Altisource was the subject of a letter Benjamin Lawsky, Superintendent of New York's Department of Financial Services, sent to Ocwen on February 26, 2014.  In the letter to Ocwen, Lawsky, New York's top bank regulator, addressed potential conflicts of interest between Ocwen and Altisource:[19]

> The Department's ongoing review of Ocwen's mortgage servicing practices has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated. Indeed, the facts our review has uncovered to date cast serious doubts on recent public statements made by the company that Ocwen has a "strictly arms-length business relationship" with those companies. We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure.
>
> . . .
>
> Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review of Ocwen's servicing operations. It is in the course of the monitorship that we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd. (together, the "affiliated companies"), all of which are chaired by William C. Erbey, who is also the largest shareholder of each and the Executive Chairman of Ocwen.

---

[19] Letter from Benjamin M. Lawsky, Superintendent of Financial Services, New York State Department of Financial Services, to Timothy Hayes, General Counsel, Ocwen Financial Corporation (Feb. 26, 2014), available at http://www.dfs.ny.gov/about/press2014/pr140226-letter.pdf.

CLASS ACTION COMPLAINT

42.     Lawsky's letter noted that "Ocwen's management owns stock or stock options in the affiliated companies," which "raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of the affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result."[20]

43.     Lawsky's review of Ocwen's operations revealed that the company's Chief Risk Officer served in the same role for Altisource, one of Ocwen's vendors, and "reported directly to Mr. Erbey in both capacities."[21]   As Lawsky explained, Ocwen and Altisource's joint Chief Risk Officer "seemed not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer."[22]  Lawsky's letter further explains that the Chief Risk Officer told the on-site compliance monitor that Ocwen "paid his entire salary, but he did not know and apparently never asked which company paid his risk management staff."[23]  Lawsky concluded that, while the Chief Risk Officer has since been removed from his role at Altisource, "his and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination."[24]

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

CLASS ACTION COMPLAINT

44.     According to Lawsky, the Department of Financial Services "review of Ocwen's mortgage servicing practices… also found that Ocwen relies extensively on affiliated companies for its information management system (from the programming of comment codes to functioning as Ocwen's IT help desk), as well as procurement of third party services," which "further demonstrates the interconnected nature of Ocwen's relationship with the affiliated companies."[25]

45.     Indeed, following the separation in 2009, Ocwen is contractually obligated to purOcwen mortgage and technology services from Altisource under service agreements that extend through 2020.[26]  Ocwen is now Altisource's largest customer, accounting for 60% of Altisource's total revenue in 2012.[27]

46.     The technology Ocwen leases from Altisource -- all of which is identical to the technology platform provided by Ocwen Solutions -- consist of the REALSuite of applications.  As part of its REALSuite platform, Altisource offers REALServicing, REALTrans, and REALRemit.  The REALServicing software -- Ocwen's primary technology application -- uses artificial intelligence, rules-based systems, scripting engines and algorithms to automate the entire residential loan servicing lifecycle, from loan setup and administration through default and REO asset management.  Altisource's REALTrans is an electronic business-to-business exchange, which automates and simplifies the ordering, tracking and fulfilling of vendor provided services related to mortgages. This technology solution, connects multiple service providers through a single platform and forms a method for managing a network of vendors.  Finally, REALRemit is an electronic invoicing and payment system, which provides vendors with the ability to submit invoices electronically for payment and to have invoice payments deposited

---

[25] *Id.*

[26] Altisource Portfolio Solutions S.A., SEC FORM 10-K (Period Ending Dec. 31, 2012), available at http://www.sec.gov/Archives/edgar/data/1462418/ 000110465913009969/a13-2839_110k.htm (last visited Sept. 9 2012).

[27] *Id.*

CLASS ACTION COMPLAINT

directly to their respective bank accounts.

47.     Based on parameters inputted into the REALSuite platform by Ocwen, the computer systems automatically implement decisions about how to manage borrowers' accounts based on internal software logic.

48.     Ocwen's technology automates the ordering, management, and payment of default-related services, including property inspections, which are handled by third party vendors from the local market.  Ocwen also assesses fees for property inspections on borrowers' accounts through these systems.

49.     The ordering of and assessment of fees on borrowers' for property inspection is a completely automated process.  If a loan in the system is past due, the guidelines indiscriminately instruct the computer to request default-related services, including an initial property inspection.  No individual assessment is made with respect to whether a property inspection is required on a particular property.  Based on these guidelines, Ocwen then automatically and indiscriminately orders, and charges borrowers fees for, property inspections at monthly intervals irrespective of whether there has been recent contact with borrower (in contravention of standard industry practice), a partial payment, or even whether the initial inspection conducted indicates a risk of loss to the lender.

50.     Rather than being motivated by a specific concern that a lender's interest in a property is at risk, Ocwen's system is programmed to order and assess borrowers' accounts for property inspections at intervals demanded by private investors and the various government-sponsored enterprises ("GSEs") that owned the mortgages serviced by Ocwen.  Of course, Ocwen has enormous incentives to do whatever is demanded by these investors as it earns billions of dollars in servicing fees from them.

51.     Irrespective of whether Ocwen is acting at the direction of these investors, however, it is the uniform mortgage note instrument executed by the borrowers (rather than just Ocwen's agreements with investors and GSEs) that supplies the purported legal justification for Ocwen's authority to bill borrowers for these inspections, and these notes *do not* permit the indiscriminate ordering and billing of property inspections engaged in

by Ocwen.  To the contrary, the mortgage notes provide that inspections may be billed to borrowers only if they are necessary to protect the lender's interest in the property.

52.     The mortgage contract between a lender and a borrower generally consists of two documents:  the promissory note ("Note") and the mortgage or deed of trust ("Security Instrument").  The mortgage contacts serviced by Ocwen are substantially similar because they conform to the standard Fannie Mae/Freddie Mac form contract. The contract contains certain disclosures describing what is supposed to happen if borrowers default on their loans.

53.     The Security Instrument discloses to borrowers that, in the event of default, the loan servicer will:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

54.     The Security Instrument further discloses that any such amounts disbursed by the servicer shall become additional debt of the borrower secured by the Security Instrument and shall bear interest at the Note rate from the date of disbursement.

55.     The Note discloses that the note holder:

> will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

Thus, the mortgage contract discloses to borrowers that the servicer will pay for default-related services when necessary, and will be reimbursed by the borrower.  It does not, however, permit such fees to be indiscriminately assessed on borrowers' accounts when they are unnecessary.

56.     In fact, GSEs like Fannie Mae expressly warned Ocwen not to charge borrowers' accounts for multiple default-related services unless the circumstances of the particular property require it.  However, based on the parameters implemented by Ocwen through it automated loan management system, Ocwen could never satisfy this condition.

57.     Plaintiff is informed and believes, and on that basis, alleges that using the enterprise and Ocwen's computerized automated mortgage loan management system, Ocwen unlawfully charged and continues to indiscriminately charge fees for unnecessary property inspections.

58.     Plaintiff is informed and believes, and on that basis, alleges Ocwen indiscriminately assesses fees for unnecessary property inspections.  Ocwen's automated loan management system is set up to order property inspections and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether the assessment of such fees is reasonable or necessary.  Although such default-related services purportedly are conducted to guard against property loss, Ocwen's practices are designed to ensure that these fees are charged to as many accounts as possible, even if the inspections are unnecessary.

59.     When a loan is delinquent, Ocwen repeatedly contacts borrowers by telephone and by letter.  In these communications, Ocwen determines whether the property is occupied.  Nevertheless, Plaintiff is informed and believes, and on that basis, alleges that guidelines inputted into Ocwen's loan management software system automatically trigger property inspections if a loan is past due by a certain number of days, without regard to the condition of the property.  After a borrower's account is past due by a set number of days, as inputted into the software, Ocwen's computer automatically generates a work order for a property inspection without human intervention.  As part of this process, Ocwen's computer system also automatically assesses fees on borrowers' accounts to charge them for these property inspections.  Moreover, so long as a borrower's account is past due by the requisite number of days inputted into the loan management software, and without regard to the condition of the property, Ocwen's system automatically continues to order and assess fees for property inspections, regardless of whether they are necessary.

60.     Plaintiff is informed and believes, and on that basis, alleges, that the ordering and assessment of property inspections is such a highly automated process that borrowers with first and second mortgages serviced by Ocwen have been assessed charges for property inspections on each mortgage during the same month.

61.     Plaintiff is informed and believes, and on that basis, alleges that Ocwen does not have a policy and/or procedure of reviewing the results of property inspection reports from third-party vendors.  Because Ocwen automatically orders property inspections, without even considering prior property inspection reports, the monthly property inspections  are neither reasonable nor appropriate to protect the note holder's interest in the property.

62.     Plaintiff is informed and believes, and on that basis, alleges that even if the property inspections were properly performed and actually reviewed by someone at Ocwen, the continuous assessment of fees for these inspections on borrowers accounts is still improper.  If the first inspection report shows that the property is occupied and in good condition, it is unnecessary and inappropriate for Ocwen's system to automatically continue to order monthly inspections.  Nothing in the reports justifies continued monitoring.

63.     As a result of Ocwen's unlawful enterprise, hundreds of thousands of unsuspecting borrowers are cheated out of millions of dollars.

## BORROWERS SUFFER HARM
## AS A RESULT OF OCWEN'S PRACTICES

64.     The indiscriminate assessment of these unnecessary property inspection fees can make it impossible for borrowers to become current on their loan.  Charges for such default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving them further into default.

65.     When borrowers get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Ocwen's practices make it increasingly difficult for borrowers to ever bring their loan current.

18

Even if borrowers pay the delinquent principal and interest payments, the default-related service fees ensure that borrowers stay in default.  Although the next payment comes in on time, often through automatic payment deductions from borrowers' bank accounts, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment.  This makes that payment late, creating a cascade of more fees, and more arrears, that keeps borrowers in delinquency.  By the time borrowers are aware, Ocwen is threatening to foreclose unless a huge payment is made, and the weight of these unnecessary fees drops borrowers into a financial abyss.

66.     As a result of Ocwen's practices, which force borrowers to move deeper into default, borrowers suffer damage to their credit score.  Ocwen provides information about borrowers' payment history to credit reporting companies, including whether they have been late with a payment or missed any payments.  By keeping borrowers in default with these practices, Ocwen affects whether borrowers can get a loan in the future – and what borrowers' interest rate will be on such loans.

67.     Additionally, as a result of Ocwen's practices, which force borrowers to move deeper into default, borrowers are driven into foreclosure.

**PLAINTIFF'S CLAIMS AGAINST OCWEN**

68.     Plaintiff Vega is a resident of Los Angeles County, California.

69.     Plaintiff Vega has a mortgage serviced by Ocwen.

70.     Ocwen continually and indiscriminately assessed fees for unnecessary property inspections on the mortgage account of Plaintiff Vega, thereby subjecting her to an invalid debt.

71.     From November 2012 through October 2013, Ocwen assessed fees for twelve property inspections, despite the fact that Plaintiff Vega maintained regular contact with Ocwen and occupied the property during that entire time period.

72.     An Account Statement dated January 17, 2013 issued to Plaintiff Vega by Ocwen included an assessment of fees for two property inspections conducted on ***back-to-back days***, January 10, 2013 and January 11, 2013.

73.    Another Account Statement dated October 17, 2013 included an assessment of $126.00 for previous property inspections and a $10.50 current property inspection fee. The statement identified two inspections within the span of 17 days on Plaintiff Vega's property, one on September 24, 2013 and the other on October 11, 2013.

74.    Ocwen failed to disclose that the lenders or investors for whom they service loans issued guidelines to Ocwen warning them not to indiscriminately charge borrowers for unnecessary, repetitive fees.

## STATUTE OF LIMITATIONS

75.    Any applicable statutes of limitations have been tolled by Ocwen's knowing and active concealment, denial, and misleading actions, as alleged herein.  Plaintiff and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiff and members of the Class could not reasonably have discovered the true nature of the Ocwen's scheme.

76.    Ocwen is under a continuous duty to disclose to Plaintiff and members of the classes the true character, quality, and nature of the fees they assess on borrowers' accounts.  Ocwen knowingly, affirmatively, and actively concealed the true character, quality, and nature of their indiscriminate assessment of unnecessary fees against borrowers' accounts, as well as the written guidelines under which Ocwen is obligated to operate and which prohibit the fees charged.  Plaintiff and members of the Class reasonably relied upon Ocwen's knowing, affirmative, and active concealment.  Based on the foregoing, Ocwen is estopped from relying on any statutes of limitation as a defense in this action.

77.    The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Ocwen's fraudulent concealment of material facts.  Plaintiff and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful fees assessed against their accounts.

78.     Legal scholars have explained that, as a result of these deceptive practices, it is impossible for borrowers to determine that they are victims of these violations, because "without a true itemization that identifies the nature of each fee, parties cannot verify that a mortgage claim is correctly calculated . . . the servicer could be overreaching and charging fees that are not permitted by law or by the terms of the contract.  . . . By obscuring the information needed to determine the alleged basis for the charges, servicers thwart effective review of mortgage claims. The system can only function as intended if complete and appropriate disclosures are made."[28]

79.     Additionally, judges examining similar conduct have found that, "[a]t the heart of the problem is [the loan servicer's] failure to disclose to its borrowers/debtors, the trustee, or the Court, the nature or amount of fees and charges assessed . . . [l]ack of disclosure facilitates the injury.  Naive borrowers/debtors, trustees and creditors rightly assume that [the loan servicer] is complying with the plain meaning of its notes, mortgages, court orders and confirmed plans.  Why would anyone assume otherwise?  . . . How are they to challenge a practice or demand correction of an error they do not know exists."[29]

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action, on behalf of herself and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

81.     The classes Plaintiff seeks to represent (collectively, the "Class") are defined as follows:

> All residents of the United States of America who had a loan serviced by Ocwen, and whose accounts were assessed fees for property inspections at any time, continuing through the date of final disposition of this action (the "Class").

---

[28] *See* Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121, 155 (2008).

[29] *See In re: Jones*, 418 B.R. 687, 699 (E.D. La. 2009).

All residents of the State of California who had a loan serviced by Ocwen, and whose accounts were assessed fees for property inspections at any time, continuing through the date of final disposition of this action (the "California Subclass").

82.  Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

83.  Plaintiff reserves the right to establish sub-classes as appropriate.

84.  This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

85.  <u>Numerosity</u>:  While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Ocwen.  At this time, Plaintiff is informed and believe that the Class includes hundreds of thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

86.  <u>Ascertainablity</u>:  Names and addresses of members of the Class are available from Ocwen.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

87.  <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because each Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

CLASS ACTION COMPLAINT

88.   <u>Adequacy</u>:  Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class, because she has no interests which are adverse to the interests of the members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

89.   <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)   The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

(b)   If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c)   Absent a class action, Ocwen likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

90.   Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

91.   The common questions of fact include, but are not limited to, the following:

(a)   Whether Ocwen engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 *et seq*.;

(b)    Whether Ocwen's practice of indiscriminately charging fees for unnecessary property inspections to borrowers, as alleged herein, is illegal;

(c)    Whether Ocwen was a member of, or participant in, the conspiracy alleged herein;

(d)    Whether Ocwen engaged in a pattern or practice of racketeering, as alleged herein;

(e)    Whether documents and statements provided to Plaintiff and members of the Class omitted material facts;

(f)    Whether Plaintiff and members of the class sustained damages, and if so, the appropriate measure of damages; and

(g)    Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

92.    In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Ocwen;

(b)    The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)    Ocwen has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the

Class on a mandatory, class-wide basis.

93. Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action

## FIRST CAUSE OF ACTION

**BROUGHT ON BEHALF OF THE CALIFORNIA SUBCLASS**
**Violation of California's Unfair Competition Law**
**(California Business & Professions Code §§ 17200 *et seq*.)**

94. Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

95. Plaintiff Vega brings this cause of action on behalf of herself and the members of the California Subclass.

96. California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described above, Ocwen has engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq*.

97. In the course and conduct of their loan servicing and collection, Ocwen fails to disclose the nature of the charges and fees assessed. Relying on Ocwen, Plaintiff Vega, and members of the California Subclass believe they are obligated to pay the amounts specified in Ocwen's communications.

98. In truth and in fact, borrowers are not obligated to pay the amounts that have been specified in Ocwen's communications concerning default-related services, including property inspections. Ocwen disguises the fact that the default-related service fees they represent as being owed relate to property inspections which were automatically ordered once the borrower's loan fell into default, without regard to the necessity of the inspection, in violation of disclosures in the mortgage contract and the servicing guidelines issued by lenders and/or investors to Ocwen warning them not to indiscriminately charge borrowers with unnecessary, repetitive fees. Contrary to Ocwen's communications, they are not legally authorized to indiscriminately assess and collect

these unnecessary fees.

99.    Ocwen's omissions of material facts, as set forth herein, constitutes an unlawful practice because they violate Title 18 United States Code sections 1341, 1343, and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711, California's Rosenthal Fair Debt Collection Practices Act, and the common law.

100.    Ocwen's omissions of material facts, as set forth herein, also constitute "unfair" business acts and practices within the meaning of California Business and Professions Code sections 17200 *et seq*., in that Ocwen's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous.  Plaintiff Vega also asserts a violation of public policy by withholding material facts from consumers. Ocwen's violation of California's consumer protection and unfair competition laws in California resulted in harm to consumers.

101.    There were reasonable alternatives available to Ocwen to further their legitimate business interests, other than the conduct described herein.

102.    California Business and Professions Code section 17200 also prohibits any "fraudulent business act or practice."  Ocwen's concealment of material facts, as set forth above, was false, misleading, or likely to deceive the public within the meaning of California Business and Professions Code section 17200.  Ocwen's concealment was made with knowledge of its effect, and was done to induce Plaintiff Vega and members of the California Subclass to pay the fees for unnecessary property inspections.

103.    Plaintiff Vega and members of the California Subclass relied on their reasonable expectation that Ocwen would comply with the disclosures set forth in the mortgage agreement, Notes, and Security Instruments and the servicing guidelines issued by lenders and/or investors to Ocwen warning them not to indiscriminately charge borrowers with unnecessary, repetitive fees, and as a result, Plaintiff Vega and members of the California Subclass relied on Ocwen's disclosures about the fees on their statements, reasonably believing the default-related service fees to be valid charges that were not unnecessary.  Had the true, indiscriminate nature of the fees been disclosed to

Plaintiff Vega and the members of the California Subclass, they would have been aware of the unnecessary nature of the fees, and Plaintiff Vega and the members of the California Subclass would have disputed the charges and not paid them.

104.   Plaintiff Vega and the members of the California Subclass have been injured in fact and suffered a loss of money or property as a result of Ocwen's fraudulent, unlawful, and unfair business practices.  Plaintiff Vega and the members of the California Subclass would not have paid Ocwen's unlawful fees or they would have challenged the assessment of such fees on their accounts had it not been for Ocwen's concealment of material facts.

105.   Ocwen has thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiff Vega and the members of the California Subclass to judgment and equitable relief against Ocwen, as set forth in the Prayer for Relief.

106.   Additionally, under Business and Professions Code section 17203, Plaintiff Vega and members of the California Subclass seek an order requiring Ocwen to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Ocwen to correct its actions.

## SECOND CAUSE OF ACTION

### Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c))

107.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

108.   Plaintiff brings this cause of action on behalf of herself and the members of the Class.

### THE ENTERPRISE

109.   Defendants Ocwen is a person within the meaning of Title 18 United States Code section 1961(3).

110.   At all relevant times, in violation of Title 18 United States Code section

1962(c), Ocwen, including its directors, employees, and agents, along with Altisource and Ocwen's property preservation and inspection vendors conducted the affairs of an associatied-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Ocwen Enterprise"). The affairs of the Ocwen Enterprise affected interstate commerce through a pattern of racketeering activity.

111.  The Ocwen Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of indiscriminately, routinely, and repeatedly, ordering, conducting, and assessing borrowers' accounts for unnecessary property inspections.

112.  While the members of the Ocwen Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise. The Ocwen Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Ocwen, Altisource, and the vendors that perform property inspections.

113.  Operating the Ocwen Enterprise according to policies and procedures developed and established by its executives, Ocwen controls and directs the affairs of the Ocwen Enterprise and uses the other members of the Ocwen Enterprise as instrumentalities to carry out Ocwen's fraudulent scheme.

114.  These policies and procedures established by Ocwen's executives include: programing Ocwen's automated loan management system to order property inspections and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether conducting such default-related services is reasonable or necessary under the circumstances; directing property inspection vendors to conduct property inspections without consideration for whether they are necessary; and providing statements that fail to disclose the true, indiscriminate nature of the unnecessary fees.

115.  The guidelines developed by Ocwen's executives -- based, in part, on guidelines issued by the lenders and/or investors for whom Ocwen services loans -- and programmed into Ocwen's loan management software system automatically trigger

property inspections if a loan is past due by a set number of days.  On a nightly basis, Ocwen's automated loan management system reviews all loans to determine which are delinquent by the specified number of days, and then orders inspections of the properties securing all such loans electronically from one of its property inspection vendors.  This entire process occurs without any human intervention.

116.   After a property inspection is ordered from Ocwen's property inspection vendors, borrowers are assessed fees for the inspection electronically by Ocwen's automated loan management system.

117.   As long as a borrower's account is past due by the requisite number of days programmed into Ocwen's loan management software, its system automatically continues to order inspections every 30 days, regardless of whether they are necessary.

118.   Ocwen's policy and procedure of ordering and assessing borrowers' accounts for property inspections when they are a certain number of days late on their mortgage is based on guidelines established by the government-sponsored enterprises ("GSEs") that own many of the mortgages serviced by Ocwen, including Fannie Mae.

119.   However, Fannie Mae has expressly warned Ocwen and other mortgage servicers not to charge borrowers for multiple property inspections unless the specific circumstances of a particular loan warrant it.  In particular, Section 203.04 (Fees for Special Services) of Fannie Mae's Single Family Servicing Guide details Fannie's Mae's expectation that every servicer will have in place clearly written policies regarding fee assessment, including Fannie Mae's limitation that fees be charged to a borrower on a repetitive basis only when required or permitted by Fannie Mae's Guides or otherwise clearly supported by the circumstances relating to a particular mortgage.  As an example, Fannie Mae's Servicing Guide expressly states that charging a delinquent borrower's account for monthly property inspections generally would not be a permissible practice unless the servicer determines that the circumstances warrant multiple inspections.

120.   Moreover, it is the uniform mortgage note instrument executed by the borrowers (rather than just Ocwen's agreements with investors and GSEs) that supplies

the purported legal justification for Ocwen's authority to bill borrowers for these inspections, and these notes *do not* permit the indiscriminate ordering and billing of multiple property inspections engaged in by Ocwen.

121.   Nevertheless, once a borrower falls behind on their mortgage payments by the specified period of time, Ocwen's loan management system automatically orders an initial drive-by inspection of the property securing that mortgage loan.  After this initial inspection, and regardless of the outcome of that inspection, Ocwen's loan management system continues to order subsequent inspections every 30-days for as long as the borrower remains delinquent.

122.   By developing and implementing policies and procedures leading to the indiscriminate, repeated, and unlawful, ordering and assessment of fees for unnecessary default-related services, Ocwen engaged in the conduct of the Ocwen Enterprise distinct from Ocwen's own affairs as a loan servicer and inconsistent with the servicing guidelines under which it is obligated to operate.

## THE PREDICATE ACTS

123.   The Ocwen Enterprise's systematic scheme to fraudulently conceal indiscriminate assessments of unnecessary third party fees on the accounts of borrowers who have mortgage loans it administers, as described above, was facilitated by the use of the United States Mail and wire.  The Ocwen Enterprise's scheme constitutes "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

124.   In violation of Title 18 United States Code sections 1341 and 1343, the Ocwen Enterprise utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Ocwen by obtaining money from borrowers using false or fraudulent pretenses.

125.   Through the mail and wire, the Ocwen Enterprise provided mortgage invoices, loan statements, payoff demands, or proofs of claims to borrowers, demanding that borrowers pay fees for unnecessary property inspections.  Defendants also accepted

payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

126.    The Ocwen Enterprise fraudulently and unlawfully assessed default-related service fees in violation of borrowers' mortgage agreements because the property inspections were unnecessary, and therefore, they violate the disclosures made to borrowers.

127.    The mortgage invoices, loan statements, or proofs of claims provided to borrowers disguised the fact that the property inspection fees assessed on borrowers' accounts were unnecessary.  By disguising the true nature of amounts purportedly owed in communications to borrowers, the Ocwen Enterprise made false statements using the Internet, telephone, facsimile, United States mail, and other interstate commercial carriers.

128.    These omissions were material to Plaintiff and the members of the Class. Had the Ocwen Enterprise disclosed the true unnecessary nature of the fees for default-related services, Plaintiff would have been aware and would have challenged Ocwen's unlawful fee assessments or they would not have paid them.

129.    Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

130.    Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, the Ocwen Enterprise engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

131.    The Ocwen Enterprise's knowledge that its activities were fraudulent and unlawful is evidenced by, among other things, the fact that they did not disclose the unnecessary nature of the fees in their communications to borrowers.

132.    The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which the Ocwen Enterprise have engaged under Title 18 United States Code section 1962(c).

133.    All of the predicate acts of racketeering activity described herein are part of

31

the nexus of the affairs and functions of the Ocwen Enterprise racketeering enterprise. The racketeering acts committed by the Ocwen Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on the members of the Class.  Because this case is brought on behalf of a class of similarly situated borrowers and there are numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiff to plead all of the details of the scheme with particularity.  Plaintiff cannot plead the precise dates of all of the Ocwen Enterprise's uses of the mail and wire because this information cannot be alleged without access to the Ocwen Enterprise's records.

134.   The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

135.   Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

136.   As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiff and members of the class have suffered substantial damages.  Members of the Ocwen Enterprise are liable to Plaintiff and members of the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

## THIRD CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act,
Conspiracy to Violate Title 18 United States Code section 1962(c)
(18 U.S.C. § 1962(d))**

137.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

138.   Plaintiff brings this cause of action on behalf of herself and the members of the Nationwide Class.

139.   As set forth above, in violation of Title 18 United States Code section 1962(d), Defendants conspired to violate the provisions of Title 18 United States Code

section 1962(c).

140.   As set forth above, the Ocwen Enterprise was aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.

141.   As a direct and proximate result, Plaintiff and the members of the Class have been injured in their business or property by the predicate acts which make up the Ocwen Enterprise's patterns of racketeering activity in that unnecessary fees for default-related services were indiscriminately assessed on their mortgage accounts.

## FOURTH CAUSE OF ACTION

**BROUGHT ON BEHALF OF THE CALIFORNIA SUBCLASS**
**Violations of the Rosenthal Fair Debt Collection Practices Act**
**(California Civil Code §§ 1788, *et seq.*)**

142.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

143.   Defendants are "debt collectors" within the meaning of California Civil Code section 1788.2(c) because Defendants sent mortgage bills to Plaintiff and members of the California Subclass, Plaintiff and members of the California Subclass made their mortgage payments to Defendants, Defendants accepted those payments, and Defendants made demands for payment, including the payment of fees for unnecessary property inspections, after default by sending letters, making telephone calls, and other attempts to collect mortgage payments and fees.

144.   The fees for unnecessary property inspections purportedly owed by Plaintiff and members of the California Subclass are a "debt" within the meaning of California Civil Code section 1788.2(d), because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

145.   As alleged herein, and as set forth in detail above, Defendants have committed violations of the Rosenthal Fair Debt Collection Practices Act, California Civil

Code section 1788, *et seq.* ("RFDCPA"), which incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act ("FDCPA), 15 U.S.C. § 1692

146.   The FDCPA and, therefore, the RFDCPA, prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e

147.   Defendants knowingly, affirmatively, and actively concealed and suppressed material facts, namely the fact that Defendants indiscriminately assess borrowers' accounts for unnecessary default-related services, which is inconsistent with the servicing guidelines under which Defendants are obligated to operate.  Contrary to Ocwen's communications, they are not legally authorized to assess and collect these unnecessary fees.

148.   Pursuant to California Civil Code sections 1788.17 and 1788.30, Plaintiff and members of the California Subclass are entitled to recover actual damages sustained as a result of Defendants' violations of the RFDCPA.  Such damages include, without limitation, monetary losses and damages.  Additionally, because Defendants' violations of the RFDCPA were committed willingly and knowingly, Plaintiff and members of the California Subclass are entitled to recover penalties of up to $1,000 per violation as provided for in the RFDCPA.

149.   Pursuant to California Civil Code sections 1788.17 and 1788.30, Plaintiff and the California Subclass are entitled to recover all attorneys' fees, costs, and expenses incurred in the bringing of this action.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

150.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

151.   Plaintiff brings this cause of action on behalf of herself and the members of

the Class.

152.   By their wrongful acts and omissions of material facts, Ocwen was unjustly enriched at the expense of Plaintiff and members of the Class.

153.   The mortgage contract with borrowers like Plaintiff and the members of the Class discloses that Ocwen will pay for default-related services when necessary, and they will be reimbursed by the borrower.  Nowhere in the mortgage contract is it disclosed that Ocwen may incur unnecessary third party fees.  Accordingly, Ocwen is aware that it is improper to indiscriminately assess unnecessary third party fees on borrowers' accounts for default-related services.

154.   Nevertheless, Ocwen assesses such fees on borrowers' accounts without adequate concern for whether they are necessary.

155.   Thus, Plaintiff and members of the Class were unjustly deprived.

156.   It would be inequitable and unconscionable for Ocwen to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

157.   Plaintiff and members of the Class seek restitution from Ocwen, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Ocwen from their wrongful conduct.

## SIXTH CAUSE OF ACTION

### Fraud

158.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

159.   Plaintiff brings this cause of action on behalf of herself and the members of the Nationwide Class.

160.   Plaintiff reasonably expected that Ocwen would comply with the disclosures set forth in the mortgage agreement, Notes, Security Instruments, and as a result, Plaintiff relied on Ocwen's disclosures about the fees on their statements, reasonably believing the

default-related service fees to be valid charges that were not unnecessary.

161.   Had the true nature of the fees been disclosed to Plaintiff and members of the Class, they would have been aware of the unnecessary nature of the fees, and Plaintiff would have disputed the charges and not paid them.

162.   As a result of Ocwen's fraudulent omissions and failures to disclose, Plaintiff and members of the Class have been injured in fact and suffered a loss of money or property.  Plaintiff and members of the Nationwide Class would have challenged the assessment of such fees on their accounts had it not been for Ocwen's concealment of material facts.

163.   Ocwen omitted and concealed material facts, as discussed above, with knowledge of the effect of concealing of these material facts.  Ocwen knew that by misleading consumers, they would generate higher profits.

164.   Plaintiff and members of the Nationwide Class justifiably relied upon Ocwen's knowing, affirmative, and active concealment.  By concealing material information about their scheme to indiscriminately assess unnecessary fees on borrowers' accounts, Ocwen intended to induce Plaintiff and members of the Nationwide Class into believing that they owed Ocwen money that it was not actually entitled to.

165.   Ocwen acted with malice, oppression, or fraud.

166.   As a direct and proximate result of Ocwen's omissions and active concealment of material facts, Plaintiff and each member of the Nationwide Class has been damaged in an amount according to proof at trial.

## **PRAYER FOR RELIEF**

Plaintiff, and on behalf of herself and all others similarly situated, request the Court to enter judgment against Ocwen, as follows:

1.      Certifying the Class, as requested herein, certifying Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel for the Class;

2.      Ordering that Ocwen is financially responsible for notifying all members of the Class of the alleged omissions discussed herein;

3.  Awarding Plaintiff and the members of the Class compensatory damages in an amount according to proof at trial;

4.  Awarding restitution and disgorgement of Ocwen's revenues or profits to Plaintiff and members of the Class;

5.  Awarding Plaintiff and the members of the Class treble damages in an amount according to proof at trial;

6.  Awarding declaratory and injunctive relief as permitted by law or equity, including:  enjoining Ocwen from continuing the unlawful practices as set forth herein, and directing Ocwen to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Ocwen by means of any act or practice declared by this Court to be wrongful;

7.  Ordering Ocwen to engage in corrective advertising;

8.  Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

9.  Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

10. For such other and further relief as the Court deems just and proper.

CLASS ACTION COMPLAINT

Dated:  June 6, 2014                    BARON & BUDD, P.C.

By:   /s/ Mark Pifko
        Mark Pifko

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
Michael Isaac Miller (SBN 266459)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333
Facsimile:   (818) 986-9698

Philip F. Cossich, Jr. (to be admitted *pro hac vice*)
David A. Parsiola (to be admitted *pro hac vice*)
COSSICH, SUMICH, PARSIOLA & TAYLOR, L.L.C.
8397 Highway 23, Suite 100
Belle Chasse, Louisiana 70037
Telephone:  (504) 394-9000
Facsimile:   (504) 394-9110

Attorneys for Plaintiff
MARY LOU VEGA, individually, and on
behalf of other members of the public
similarly situated

CLASS ACTION COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial of her claims by jury to the extent authorized by law.

Dated:  June 6, 2014                    BARON & BUDD, P.C.

By:   /s/ Mark Pifko
      Mark Pifko

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
Michael Isaac Miller (SBN 266459)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333
Facsimile:   (818) 986-9698

Philip F. Cossich, Jr. (to be admitted *pro hac vice*)
David A. Parsiola (to be admitted *pro hac vice*)
COSSICH, SUMICH, PARSIOLA & TAYLOR, L.L.C.
8397 Highway 23, Suite 100
Belle Chasse, Louisiana 70037
Telephone:  (504) 394-9000
Facsimile:   (504) 394-9110

Attorneys for Plaintiff
MARY LOU VEGA, individually, and on
behalf of other members of the public
similarly situated

CLASS ACTION COMPLAINT