**O**

# United States District Court
# Central District of California

| | |
|---|---|
| MARY LOU VEGA, individually and on behalf of other members of the public similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>OCWEN FINANCIAL CORPORATION; OCWEN LOAN SERVICING, LLC,<br><br>               Defendants. | Case No: 2:14-cv-04408-ODW(PLAx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [29]** |

## I.   INTRODUCTION

On December 1, 2014, the Court issued an Order granting in part and denying in part the Motion to Dismiss filed by Defendants Ocwen Financial Corporation and Ocwen Loan Servicing, LLC (collectively "Ocwen"). (ECF No. 50.) On February 25, 2015, the Court *sua sponte* vacated that Order pursuant to Federal Rule of Civil Procedure 60(a). (ECF No. 61.) The Court advised Ocwen and Plaintiff Mary Lou Vega that it would reconsider its previous decision, all case management deadlines were vacated, and a new order would issue. (*Id.*) Upon reconsideration, the Court now **GRANTS** Ocwen's Motion to Dismiss. (ECF No. 29.)

/ / /

## II.   FACTUAL BACKGROUND

Ocwen operates a residential mortgage servicing business. (Compl. ¶ 1.) From November 2012 through October 2013, Ocwen serviced Vega's defaulted mortgage. (*Id.* ¶¶ 69–71.) Vega does not allege that she made any mortgage payments to Ocwen.

In her putative class-action Complaint, Vega challenges the property inspection fees Ocwen added to her debt during the servicing period. Vega alleges that Ocwen assessed twelve property inspection fees despite the fact that she maintained regular contact with Ocwen and occupied the property. (*Id.* ¶ 71.) Vega claims that Ocwen utilizes a computer program to automatically order and manage monthly property inspections for any borrower in default. (*Id.* ¶¶ 48–49.) The borrowers are then automatically charged for the property inspections. (*Id.* ¶ 49.) Vega claims that this automated process prohibits any individualized determination as to whether such property inspections are necessary. (*Id.* ¶¶ 59–61.) According to Vega, "[i]f the first inspection report shows that the property is occupied and in good condition, it is unnecessary and inappropriate for Ocwen's system to automatically continue to order monthly inspections." (*Id.* ¶ 62.) She claims "the mortgage notes provide that inspections may be billed to borrowers only if they are necessary to protect the lender's interest in the property." (*Id.* ¶ 51.)

Thus, the core of Vega's Complaint is as follows: "Ocwen continually and indiscriminately assessed fees for unnecessary property inspections on the mortgage account of Plaintiff Vega, thereby subjecting her to an invalid debt." (*Id.* ¶ 70.) She further alleges that "Ocwen fails to disclose the nature of the charges and fees assessed." (*Id.* ¶ 97.) Ocwen seeks to certify a class defined as "[a]ll residents of the United States of America who had a loan serviced by Ocwen, and whose accounts were assessed fees for property inspections at any time, continuing through the date of final disposition of this action." (*Id.* ¶ 81.) Vega also defines a subclass of California residents. (*Id.*)

/ / /

2

Vega brings six causes of action in her putative class-action Complaint: (1) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (2) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (3) RICO conspiracy, 18 U.S.C. § 1962(d); (4) violations of the Rosenthal Fair Debt Collections Practices Act (the "Rosenthal Act"), Cal. Civ. Code §§ 1788, *et seq.*; (5) unjust enrichment; and (6) fraud. (*See* Compl.)  Pending before the Court is Ocwen's Motion to Dismiss the entire Complaint. (ECF No. 29.)  Vega filed a timely Opposition (ECF No. 38 ["Opp. Br."]) and Ocwen a timely Reply (ECF No. 42).

## III.   LEGAL STANDARD

Pursuant to Rule 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleading in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (internal quotation marks and citations omitted).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004) (internal quotation marks and citations omitted).  "If a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint.

These documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim." *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987) (internal citations omitted). The Court may consider contracts incorporated in a complaint without converting a motion to dismiss into a summary judgment hearing. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).

## IV.   DISCUSSION

There are two independent grounds to dismiss the Complaint.  First, Vega's Complaint is based on factual allegations not supported by her own mortgage agreement.  Because Vega argues someone else's mortgage agreement, dismissal is appropriate.  Second, each cause of action as alleged fails to state a claim upon which relief can be granted.  The claims assert unrecognized theories of liability.

**A.   Vega's Theory of the Case is Not Supported by Her Mortgage Agreement**

Vega mistakenly argues someone else's mortgage agreement.  Vega's theory of liability is two-fold.  First, she claims that Ocwen can only charge her for property inspections that are "necessary."  Second, by using an automated system to order inspections and charge the borrower, Ocwen is not making any determination as to whether the inspections are "necessary."  In other words, because the fees can only be imposed when necessary, Ocwen's use of automation is *per se* unlawful—the necessity requirement mandates an individualized assessment before any inspection is conducted.

Vega leaves no doubt that "necessity" is critical to her legal theory.  By the Court's count, this term, or some variation of it, appears fifty-one times in Vega's Complaint.  If a particular act is only authorized when necessary, the prospective actor is held to quite a demanding standard before it can act.  In her Complaint, Vega claims that "the mortgage notes provide that inspections may be billed to borrowers only if they are *necessary* to protect the lender's interest in the property."  (*Id.* ¶ 51 [emphasis added].)

However, Vega is mistaken.  Her mortgage agreement contains no such requirement.  There are two relevant provisions in her mortgage agreement. Paragraph 9 of Vega's mortgage agreement states the following:  "If . . . Borrower fails to perform the covenants and agreement contained in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property."  (ECF No. 31, Ex. A ¶ 9.)  This provision authorizes Ocwen to take "reasonable or appropriate" steps to protect Vega's property should she violate the terms of the mortgage agreement.  Paragraph 14 later states:   "Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purposes of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees."  (*Id.* ¶ 14.)  This provision authorizes Ocwen to then charge Vega for the "reasonable or appropriate" steps it took under Paragraph 9.  Paragraph 14 unequivocally states that property inspection fees are fees accrued "for the purpose of protecting Lender's interest in the Property."

The terms "necessity" or "necessary" do not appear in either Paragraph 9 or 14. In fact, the Court cannot find the term anywhere in Vega's mortgage agreement. Vega's entire legal theory is thus dependent on the Court drafting a new, and highly demanding, term to her mortgage agreement.  The Court rejects this invitation.  If Vega's entire legal theory is dependent on the necessity of property inspections, yet her mortgage agreement places no such requirement on Ocwen, then Vega has not stated a claim upon which relief can be granted.  Her own mortgage agreement is fatal to her legal theory.

The Court eventually figured out why Vega claimed a non-existent term was in her mortgage agreement—Vega's counsel decided to reuse a previously filed complaint.  Her counsel specializes in suing large banking institutions for imposing unnecessary property inspection fees.  Each of these currently pending lawsuits relies

on terms in a mortgage agreement that authorize property inspections only when "necessary." *See, e.g., Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1068 (N.D. Cal. 2013) ("Plaintiffs allege that their mortgage contracts disclosed that Defendants will pay for default-related services when necessary[.]"); *Stitt v. Citibank, N.A.*, 942 F. Supp. 2d 944, 948 (N.D. Cal. 2013) ("Plaintiffs allege that their mortgage contracts disclosed that Defendants will pay for default-related services when necessary[.]"); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 924 (N.D. Cal. 2013) ("Plaintiffs allege their mortgage contracts disclosed that Defendants will pay for default-related services when necessary[.]"). Vega's mortgage agreement has no such requirement. When confronted with this reality, Vega quickly backtracked in her Opposition Brief—Vega no longer even argues that property inspections must be necessary, nor could she. (*See* ECF No. 38.) This is quite the departure from her repeated insistence in the Complaint that the property inspections are not necessary. Vega uses her Opposition Brief to amend her Complaint. For the purposes of a Rule 12(b)(6) motion, the Court's duty is to focus on the merits of the Complaint and not new arguments proffered in responsive briefing. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 1002 (9th Cir. 1999) (reviewing only allegations in the complaint when reviewing a motion to dismiss).

There is no legal principle that allows the Court to pull demanding standards out of thin air and add them to a written contract between two parties. Based on this error alone, the Court must dismiss Vega's entire Complaint.

**B.    Theories of Wrongdoing**

The flaws in Vega's case are not limited to her reliance on someone else's mortgage agreement. Vega's entire theory of wrongdoing is legally deficient because she tries to spin a breach of contract claim into a fraud case. This is a fundamental problem that infects each cause of action. The Court will first explain Vega's two theories of liability and why each theory is aggrandized beyond common sense. In / / /

6

Part IV.C, the Court will then apply these two theories of wrongdoing to the six causes of action in this case.

### 1.    First Legal Theory:  The "Manner" of Ordering Inspections

Vega's first theory of wrongdoing is based on the "manner" in which Ocwen orders the property inspections.  Vega alleges that "[t]he ordering of and assessment of fees on borrowers' for property inspection is a completely automated process . . . [and] [n]o individual assessment is made with respect to whether a property inspection is required on a particular property."  (Compl. ¶ 49.)   She further explains that "Ocwen then automatically and indiscriminately orders, and charges borrowers fees for, property inspections at monthly intervals irrespective of whether there has been recent contact with borrower . . . [or] a partial payment, or even whether the initial inspection conducted indicates a risk of loss to the lender." (*Id.*)  In her Opposition Brief, Vega pointedly explains that "this case is about the *manner* in which Defendants indiscriminately charge homeowners fees for property inspections without appropriate consideration of the circumstances of a homeowners' particular loan." (Opp. Br. at 2 [original emphasis].)  This theory focuses on the automated nature of the property inspection ordering process and the lack of individual consideration.

On its face, these allegations appear nefarious.  Ocwen is allegedly acting "indiscriminately" and not giving "appropriate consideration" to its actions.  That type of conduct is generally not favored under the law.  This begs the question; what standard of conduct is Ocwen required to prescribe?  The answer; the terms in Vega's mortgage agreement.

As explained *supra*, Vega's mortgage agreement does not require a "necessity" determination before Ocwen can charge Vega property inspection fees.   When Paragraphs 9 and 14 are read together, it appears that Vega's mortgage *defines* property inspections as reasonable acts.  The "reasonable or appropriate" language in Paragraph 9 is not a qualifying condition for property inspections.   This is the inescapable conclusion when Paragraphs 9 and 14 are read together because:

(1) Ocwen can do what is reasonable to protect its interest; (2) Ocwen can charge Vega for those reasonable acts done in furtherance of protecting that interest; (3) a property inspection fee is specifically listed as a charge authorized for acts done in furtherance of protecting Ocwen's interest; so therefore (4) a property inspection *must* be a reasonable act under the mortgage agreement.  The mortgage would not list property inspection fees as an authorized charge if property inspections were not reasonable or appropriate acts under the agreement.  Thus, the terms of the mortgage agreement do not mandate a reasonableness determination before Ocwen can conduct a property inspection—the terms merely state that property inspections are reasonable and appropriate acts in the event of a default.  However, to read the mortgage agreement in light most favorable to Vega, the Court will assume that Ocwen can only assess property inspection fees when "reasonable."

When Vega's theory of wrongdoing is transposed on the terms of her own mortgage agreement, clarity begins to dissipate.  Vega claims that Ocwen must give "appropriate consideration [to] the circumstances of a homeowners' particular" loan before it can order a property inspection, while the agreed upon contract states that Ocwen can order reasonable property inspections when Vega goes into default.  Is automated ordering of property inspections "reasonable" under the terms of the mortgage agreement?  Such a question is a breach of contract claim and nothing more.  A factfinder could reasonably conclude that the contractual terms are broad enough to authorize automated property inspections.  A factfinder could also find that Ocwen breached the mortgage agreement by not acting reasonably when ordering inspections automatically.

Ocwen could avoid *all* liability based on the plain language of the mortgage agreement.  It is entirely possible that the "manner" Ocwen orders property inspections is authorized by the mortgage agreement.  The term "reasonable" is quite broad, and there is nothing *per se* unreasonable about automating a process.  Vega's "manner" theory of wrongdoing is a dispute over the contractual language in the

mortgage agreement and fully resolved by the agreed-upon contract between the parties. The Court will not allow Vega to artfully plead this contract dispute as a fraud case. This is not a fraud case.

The Court further rejects Vega's characterization of Ocwen's conduct as "indiscriminate." Vega repeatedly uses this term to cast Ocwen's conduct in a negative light. However, Vega's own Complaint contradicts her indiscriminate claims. Vega alleges that Ocwen orders "property inspections at monthly intervals" through an "automated process." (Compl. ¶ 59 .) She also claims that "[t]he ordering of and assessment of fees on borrowers' for property inspection is a completely automated process." (Compl. ¶ 49.) Based on these allegations, Ocwen is not acting randomly or carelessly. In fact, it is acting quite the opposite—it is acting regularly and methodically. And whether this deliberate and cyclical conduct is unreasonable is an issue of contract interpretation.

In clarifying her legal theory of wrongdoing, Vega points to *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332 (S.D. Iowa 2013). Vega goes as far as claiming that her "allegations are virtually identical to the legal theory" in *Huyer*. (Opp. Br. at 3.) Vega specifically points to a passage from *Huyer*, which states that the defendant's "policy of indiscriminately ordering property inspections for all mortgage loans meeting [ ] delinquency criteria that Plaintiffs challenge in this lawsuit." *Huyer*, 295 F.R.D. at 335. However, the mortgage agreement in *Huyer*—previously captioned as *Young v. Wells Fargo & Co.*—is not the same as Vega's mortgage agreement. In *Young*, the court explained that "Plaintiffs refer to contract language that they assert restricts fees to those reasonably *necessary* to protect the interest of the lender." *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1034–35 (S.D. Iowa 2009) (emphasis added). An automatic process and a "necessity" requirement are inherently at odds with one another. Here, there is no requirement that Ocwen only act when necessary. As such, an automatic process and a "reasonable" requirement might be

/ / /

9

coextensive.  The Court is not compelled nor inclined to follow non-binding precedent which involved a mortgage agreement with a "necessary" requirement.

According to Vega, "this case is about the manner" property inspections are ordered.  If that is true, Vega has alleged nothing more than a breach of contract claim.  Yet Vega is bringing a host of fraud and deception claims.  The Court will not allow Vega to spin a simple contract dispute into something more.  Each cause of action is independently addressed *infra*.

### 2.    Second Legal Theory:  Failure to Disclose

Vega's second theory of wrongdoing is Ocwen's alleged concealment of material facts on her billing statement.  While Vega claims that her "manner" theory of wrongdoing is what "this case is about," allegations regarding Ocwen's failure to disclose material facts constitute the bulk of the Complaint.  Every single cause of action specifically references the failure to disclose while not even mentioning Vega's manner theory.  Vega's theory of wrongdoing based on a failure to disclose is generally stated in the Complaint as follows:  "Ocwen fails to disclose the nature of the charges and fees assessed."  (Compl. ¶ 98.)  Vega also alleges that "[h]ad the true indiscriminate nature of the fees been disclosed to Plaintiff Vega and the members of the California Subclass, they would have been aware of the unnecessary nature of the fees, and Plaintiff Vega and the members of the California Subclass would have disputed the charges and not paid them."  (Compl. ¶ 103.)

This theory of wrongdoing is illogical.  Vega does not allege that the property inspection fees were inflated or concealed on her monthly billing statement.  In fact, Ocwen claims—and Vega does not dispute or allege otherwise—that the fees were clearly labeled and itemized on her monthly bill.  Instead, Vega's theory of wrongdoing is based on Ocwen's failure to disclose that the imposed fees were "unnecessary."  In other words, because Ocwen did not label each itemized property inspection as "unnecessary" on her monthly billing statement, Ocwen has committed a wrongdoing.  Vega believes that Ocwen's failure to admit breach of contract liability

in her monthly statement subjects it to further liability.  This theory certainly puts Ocwen between a rock and a hard place.

Vega's entire grievance with Ocwen is a basic contract dispute.  Vega's mortgage agreement explicitly authorizes property inspections and her monthly bill while she was in default disclosed that she was charged for such inspections.  While there may be a *disagreement* regarding the terms in the mortgage agreement, and whether the property inspections were "reasonable" under the mortgage agreement, a mere disagreement does not create additional liability.  The failure to concede liability in a billing statement does not then create additional causes of action.  It would be absurd for Ocwen to print "unnecessary property inspection" on each billing statement.  There is no wrongdoing in Vega's billing statement because Ocwen did not concede breach of contract liability.

In her Opposition Brief, Vega directs the Court's attention to a series of other property inspection cases pending in federal court, all of which survived a Rule 12(b)(6) motion.  (Opp. Br. at 22–23.)  Vega claims that no "other court . . . has ever condoned Defendants' practices at issue here."  (*Id.* at 22.)  However, every case involving property inspection fees included allegations that the mortgage servicer labeled the property inspections as something other than property inspections.  *See, e.g., Ellis*, 950 F. Supp. 2d at 1068 ("Defendants identified the marked-up fees as 'Miscellaneous Fees,' 'Corporate Advances,' 'Other Fees,' or 'Advances' on the mortgage statements."); *Stitt*, 942 F. Supp. 2d at 949 ("Defendants identified the marked-up fees as 'Delinquency Expenses' on mortgage statements."); *Bias*, 942 F. Supp. 2d at 924 ("Defendants identified the marked-up fees as 'Other Charges' or 'Other Fees' on mortgage statements."); *Young*, 671 F. Supp. 2d at 1013 ("In addition, Plaintiffs assert that Wells Fargo repeatedly sent Plaintiffs materially false and misleading agreements, contracts, and monthly mortgage statements by mail and wire, and that the scheme was designed to conceal its existence, *i.e.*, by listing the property inspection fees as 'other charges' on mortgage statements."); *Cirino v. Bank of Am.,*

*N.A.*, No. 2:13-cv-08829, ECF No. 41 (C.D. Cal. Oct. 1, 2014) ("Plaintiff asserts that Defendants describe property inspection fees only as 'fees due' on borrowers' loan statements . . . and 'omit a true itemization that identifies the nature of each fee.'").

Vega makes no such allegations here. The *only* alleged failure to disclose relates to Ocwen's decision to not use the term "unnecessary" on the billing statements. That decision by Ocwen does not arise to the level of fraud or deception. The Court will explain *infra* how this perplexing theory fails to state a cause of action for each claim in the Complaint.

## C.  Substantive Claims

The Court now turns to each cause of action to explain why Vega's exaggerated theories of wrongdoing fail to state a claim for relief on all six counts in the Complaint.

### 1.  Count 1:  UCL

#### a.  Statutory Standing

Standing to bring a claim under the UCL is limited to a person "who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. To establish standing under the UCL a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that the economic injury was the result of, i.e., *caused by*, the unfair business practice . . . that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (original emphasis); *see also Rubio v. Capital One Bank*, 613 F.3d 1195, 1203–04 (9th Cir. 2010). The California Supreme Court instructs that the two prongs of injury—"injury in fact" and "lost property or money"—will often overlap. *Kwikset*, 51 Cal. 4th at 322–23. When the two overlap, a plaintiff must "demonstrate some form of economic injury," which is "substantially narrower than federal standing under article III, section 2 of the United States Constitution[.]" *Id.* at 324. "Because the lost money or property requirement is more difficult to satisfy than that of injury in fact [under

Article III], for courts to first consider whether lost money or property has been sufficiently alleged or proven will often make sense.  If it has not been, standing is absent and the inquiry is complete."  *Id.* at 325.

There "are innumerable ways in which economic injury from unfair competition may be shown.  A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."  *Id.* at 323.

At issue is whether Vega "lost property or money" when Ocwen added a monthly fee to her debt.  Vega never alleges that she made a single payment to Ocwen, and she concedes that she was in default the entire period Ocwen serviced her mortgage.  According to Vega, this is not a problem because "the mere assessment of an invalid debt confers standing."  (Opp. Br. at 6.)  In support of this claim, Vega cites numerous cases regarding injury-in-fact under Article III.  However, it is undisputed that UCL standing is "substantially narrower" than Article III standing, *see Kwikset*, 51 Cal. 4th at 324, and thus the Court cannot rely on that line of cases.  A showing of only Article III injury is not enough.

While Vega's reliance on cases regarding Article III standing is improper, her injury is, however, sufficient to confer UCL standing.  The California Supreme Court is clear that an economic injury occurs when a plaintiff has "a present or future property interest diminished."  *Id.* at 323.  An increase in Vega's debt diminishes the equity she obtained in her home, and thus she is financially injured when her debt increases.  The fact that she failed to make any mortgage payments is not dispositive.  "Even if a borrower has been charged but has not yet paid for the expense, the debt is an economic injury and lien upon his property sufficient to confer standing to assert a claim under the unfair competition law."  *Lane v. Wells Fargo Bank, N.A.*, No. C 12-04026, 2013 WL 3187410, at *11 (N.D. Cal. June 21, 2013).  At this stage in the

litigation, Vega has alleged just enough to establish UCL standing.   There is no evidence that Vega's debts were excused or discharged through a foreclosure sale or bankruptcy, which would then strip Vega of standing to bring her UCL claim.   *See Collins v. U.S. Bank Nat. Ass'n*, No. 2:14-cv-07726, 2015 WL 470289, at \*5 (C.D. Cal. Feb. 3, 2015) (holding no UCL standing when plaintiff's debt, which allegedly contained unlawful fees, was excused through foreclosure).

### b.   Theory of UCL Liability

The UCL prohibits "any unlawful, unfair, or fraudulent business act or practice."   Cal. Bus. & Prof. Code § 17200.   Ocwen challenges Vega's UCL claim under all three prongs of the statute.

### i.   *Unfair Prong*

Vega's "unfair" prong allegation is stated as follows:  "Ocwen's omissions of material facts . . . also constitute 'unfair' business acts and practices within the meaning of [the UCL] in that Ocwen's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous." (Compl. ¶ 100.)  In other words, Vega alleges that Ocwen's decision to "omi[t]" the "unnecessary" label on her monthly billing statement is an unfair business practice.

"An unfair business practice is one that either 'offends an established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008) (quoting *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509 (1984), *abrogated on other grounds in Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999)).

Vega's "unfair" allegations are exclusively based on Ocwen's failure to label the property inspections as "unnecessary."  Similar to the other claims in this case, this failure to disclose is not actually a wrongdoing.  It is also not unfair.  There is no precedent anywhere to support Vega's theory of UCL unfair liability.  The Court / / /

1  rejects a UCL liability theory based on a defendant's "omission[] of material facts"
2  where the omission is the failure to admit a breach of contract.

3      While this cause of action only relies on a failure-to-disclose theory of
4  wrongdoing, Vega argues her "manner" theory in her Opposition Brief and claims that
5  the manner in which the property inspection were ordered was "unfair."  (Opp. Br. at
6  7–9.)  Contrary to Vega's insistence, the Court is heavily persuaded by the California
7  appellate court opinion in *Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th
8  1158 (2002).  The issue in *Walker* is as follows:

9           When a borrower is in default on a loan secured by real
10          property, Countrywide conducts inspections of the property,
11          the cost of which Countrywide charges to the delinquent
12          borrower. The [plaintiffs] challenge Countrywide's practice
13          of passing the cost of conducting property inspections to
14          delinquent borrowers, contending that the practice is
15          unlawful, unfair, and deceptive under [the UCL].

16  *Id.* at 1164.

17      The mortgage agreement in question authorized the defendant to "do and pay
18  for whatever is necessary to protect the value of the Property."  *Id.* at 1165.  "When a
19  default on a loan secured by residential property occurs, Countrywide's computer
20  program orders property inspections depending on the existence of factors such as the
21  amount of time the loan has been delinquent and whether the property is subject to a
22  foreclosure sale.  Countrywide orders follow-up inspections each month if the default
23  is not cured."  *Id.* at 1166.  The plaintiffs alleged that it was unreasonable for
24  Countrywide to charge them twelve property-inspection fees over the course of twelve
25  months, even though the property remained occupied.  *Id.* at 1165.

26      The *Walker* court upheld all of Countrywide's practices.  The court explained
27  that the plaintiff's "deed of trust 'unequivocally permits' Countrywide to charge the
28  [plaintiffs] with the reasonable cost of the property inspection" and the deed put the

plaintiffs "on notice that inspections could occur in the event of a default." *Id.* at 1177. The court concluded that there "is nothing inherently unfair" about this process. *Id.* The court even went as far as concluding that "[e]ven if an initial inspection reveals that the home continues to be occupied and maintained, a lender has legitimate reasons to reinspect the property every 30 to 60 days thereafter." *Id.* at 1176. The *Walker* court continued: "The status and ability of a borrower unable to make monthly loan payments is uncertain and conceivably could change from month to month. Such a borrower might be unable to maintain the property and is less likely to occupy the property than a borrower current on a loan. . . . There is nothing 'unethical' about passing a reasonable cost of protecting the security to the defaulting borrower." *Id.* The *Walker* court ultimately held that "the inspection fees in this case do not violate the unfair competition law." *Id.* at 1178.

The *Walker* opinion, which involves a nearly identical factual backdrop, suggests that Ocwen did nothing "unfair" here. In fact, *Walker* suggests that all of Ocwen's alleged acts are perfectly legal—and ethical—under California law. Vega's mortgage agreement authorized property inspections, and the monthly reoccurring inspections were fully disclosed on her monthly bill. Vega argues that *Walker* is "entirely inapposite to the facts of this case." (Opp. Br. at 7.) According to Vega, the *Walker* court did not address her theory of UCL liability which challenges "the *manner* in which Defendants charge borrowers fees for property inspections ordered without regard to the circumstances relating to a particular mortgage." (*Id.* at 8 [original emphasis].) The Court rejects Vega's argument on two grounds. First, Vega shifts her legal theory in her Opposition Brief. The unfair allegation in the Complaint asserts that "Ocwen's omission[] of material facts" is unfair, and now she claims that "the manner" in which the inspections were ordered is unfair. The Court will not allow Vega to change her legal theory of "unfair" UCL liability in her Opposition Brief.

/ / /

Second, *Walker* specifically approved *automated* monthly property inspections "[e]ven if an initial inspection reveals that the home continues to be occupied and maintained." *Walker*, 98 Cal. App. 4th at 1176. The *Walker* court upheld such practices without any consideration of how the monthly bill was labeled and called the practice "[]ethical." *Walker* specifically upheld the manner in which the property inspection fees were assessed. While *Walker* was decided at summary judgment, the factual allegations in this case are nearly identical. The only additional allegation is Vega's claim that Ocwen committed fraud by not admitting breach of contract liability on the monthly billing statement. As a result, the legal conclusions regarding property inspection practices in *Walker* are binding on this Court. Vega's bold claim of "unethical and unscrupulous" conduct is legally unsupported.

For the numerous reasons stated above, the Court finds that Vega failed to state a claim for relief under the UCL's unfair prong.

### ii. *Fraudulent Prong*

Vega's UCL fraud claim is stated as follows: "Ocwen's concealment of material facts . . . was false, misleading, or likely to deceive the public within the mean of [the UCL]. Ocwen's concealment was made with the knowledge of its effect, and was done to induce Plaintiff Vega and members of the California Subclass to pay the fees for unnecessary property inspections." (Compl. ¶ 102.)

"Unlike common-law fraud claims that focus on the victim's reliance or damages, the UCL focuses on the perpetrator's behavior: 'to state a claim under either the UCL or the false advertising law . . . it is necessary only to show that members of the public are likely to be deceived.'" *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)).

Once again, Vega's theory of concealment is based on a legally meritless theory of liability. Vega attempts to argue that the public is "likely to be deceived" because Ocwen does not tell borrowers that the monthly property inspections were

17

"unnecessary."  There is simply no deception because Ocwen failed to concede a breach of contract.  And once again, this case does not involve allegations of misleading labels that would not put a borrower on notice that they were being charged for property inspections.  *See, e.g., Ellis*, 950 F. Supp. 2d at 1068 ("'Miscellaneous Fees,' 'Corporate Advances,' 'Other Fees,' or 'Advances'"); *Stitt*, 942 F. Supp. 2d at 949 ("'Delinquency Expenses'"); *Bias*, 942 F. Supp. 2d at 924 ("'Other Charges' or 'Other Fees'"); *Young*, 671 F. Supp. 2d at 1013 ("'other charges'"); *Cirino*, No. 2:13-cv-08829, ECF No. 41 ("'fees due'").

If Vega was aware that she was being charged for property inspections, she could refer to her mortgage agreement which clearly states that property inspection fees are authorized.  Vega could then raise a contractual dispute with Ocwen if she felt that the inspection fees were not authorized under the mortgage agreement.  As a matter of law, there is no deception or fraud here.  Ocwen's decision to not label the property inspections as "unnecessary" does not turn this breach of contract case into a "likely to deceive" UCL fraud claim.  The Court concludes that Vega failed to state a claim under the UCL fraud prong.

### iii.   *Unlawful Prong*

Vega's unlawful claim is stated as follows:  "Ocwen's omissions of material facts . . . constitutes an unlawful practice because they violate Title 18 United States Code sections 1341, 1343, and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711, California's Rosenthal [Act], and the common law." (Compl. ¶ 99.)

The UCL "creates an independent action when a business practice violates some other law."  *Walker*, 98 Cal. App. 4th at 1170.  "Unlawful acts are anything that can properly be called a business practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made."  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (internal quotation marks and citations omitted).  "To be 'unlawful' under the UCL,

the advertisements *must* violate another 'borrowed' law." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (emphasis added).

As explained *infra*, Vega has no claim under RICO, the Rosenthal Act, common law fraud, or common law unjust enrichment. The other "borrowed" statutes listed in her Complaint are laws prohibiting either fraud or deceit. *See* 18 U.S.C. § 1341 ("Frauds and swindles"); 18 U.S.C. § 1343 ("Fraud by wire, radio, or television"); Cal. Civ. Code §1572 ("Actual fraud"); Cal. Civ. Code § 1573 ("Constructive fraud"); Cal. Civ. Code § 1709 ("Deceit; damages"); Cal. Civ. Code § 1710 ("Deceit defined"); Cal. Civ. Code § 1711 ("Deceit to defraud public or particular class."). As explained to the point of exhaustion, Vega has failed to allege any conduct that could be fairly considered fraud or deceit. Ocwen's failure to concede a breach of contract does not rise to the level of fraud or deceit. As a result, there is no "borrowed" law to support Vega's unlawful prong claim. The Court dismisses Vega's UCL claim in its entirety.

## 2. Counts 2 and 3: RICO

### a. Standing

Statutory standing under RICO is narrower than injury-in-fact standing under Article III. *See Zazzali v. Eide Bailly LLP*, No. 12-cv-00349, 2013 WL 6045978, *28 n.24 (D. Idaho Nov. 14, 2013) ("RICO standing is a more rigorous matter than standing under Article III."). "To have standing under § 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate cause." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). The Ninth Circuit "requires that a plaintiff asserting injury to property allege 'concrete financial loss.'" *Id.* at 975 (internal citations omitted).

UCL standing was proper under the "diminished property value standard" from *Kwikset*. It is difficult to conclude that the "concrete financial loss" standard is as

expansive as the UCL's standard.  There is no Ninth Circuit authority directly on point.  Vega argues that an injury to a property interest "even in the absence of financial injury" is sufficient to satisfy RICO standing.  (Opp. Br. at 13.)  The Court disagrees with Vega that RICO standing reaches that far and is not inclined to conclude that the mere assessment of a debt is a "concrete financial loss."  However, the Court can avoid the issue entirely because the substantive allegations fail to state a claim for RICO liability.

### b.    Predicate Act

"To state a civil RICO claim, plaintiffs must allege (1) conduct (2) of an enterprise (3) though a pattern (4) of racketeering activity (5) causing injury to plaintiffs' 'business or property'"  *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001) (citing 18 U.S.C. § 1964(c)).  The predicate criminal acts that comprise racketeering activing are set out in § 1961(1).   The Court will focus its attention exclusively on the predicate act allegations.

Vega explains the alleged RICO predicate act as follows:  "The Ocwen Enterprise fraudulently and unlawfully assessed default-related service fees in violation of borrowers' mortgage agreements because the property inspections were unnecessary, and therefore, they violate the disclosures made to the borrowers." (Comp. ¶ 126.)  She further claims that the "mortgage invoices, loan statements, or proofs of claims provided to borrowers disguised the fact that the property inspection fees assessed on borrowers' accounts were unnecessary."  (*Id.* ¶ 127.)  Vega also claims that "[t]he Ocwen Enterprise's knowledge that its activities were fraudulent and unlawful is evidenced by, among other things, the fact they did not disclose the unnecessary nature of the fees in their communications to borrowers."  (*Id.* ¶ 131.) According to Vega, all of this conduct is evidence that Ocwen engaged in mail or wire fraud.  (*Id.* ¶ 129.)

Vega alleges that her disclosure theory of wrongdoing constitutes the predicate act necessary to establish RICO liability.  As explained *supra*, this alleged failure to

disclose is inherently flawed.  The failure to concede breach of contract liability does not create RICO liability.  *See, e.g.*, *Annulli v. Panikkar*, 200 F.3d 189, 200 (3d Cir. 1999), *abrogated on other grounds in Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000) ("[I]f garden-variety state law crimes, torts, and contract breaches were to constitute predicate acts of racketeering (along with mail and wire fraud), civil RICO law, which is already a behemoth, would swallow state civil and criminal law whole. Virtually every litigant would have the incentive to filed their breach of contract and tort claims under the federal civil RICO Act . . . .");  *G.K. Las Vegas Limited P'ship v. Simon Property Group, Inc.*, 460 F. Supp. 2d 1222, 1236 (D. Nev. 2006) ("Although, economic loss doctrine does not as a general rule preclude claims for violations of Nevada RICO, a plaintiff cannot state a claim under the statute by simply artfully pleading what is essentially a breach of contract claim.").

Vega points to *Young* to support her RICO claim.  (Opp. Br. at 19.)  However, the predicate act in *Young* was not the failure to concede breach of contract liability. Instead, the "[p]laintiffs pleaded that Wells Fargo was engaged in a cohesive scheme in which the predicate acts of mail and wire fraud involved *misrepresentations* of both excessive late fees and inspection fees."  *Young*, 671 F. Supp. 2d at 1027 (emphasis added).  The inspection fees were allegedly misrepresented as "other charges" on the billing statement.  *Id.* at 1013.  There are no allegations here involving an actual misrepresentation of the fees.  The Court cannot rely on *Young* to support Vega's theory of RICO liability.  As a result, Vega has no precedential support for her position.  No court has found that a failure to concede a breach of contract constitutes a RICO predicate act.

"[C]ourts should strive to flush out frivolous RICO allegations at an early stage of the litigation."  *Wagh v. Metris Direct Servs., Inc.*, 348 F.3d 1102, 1008–09 (9th Cir. 2004), *overruled on other grounds in Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007).  Here, the Court is doing just that.  The alleged predicate act is Ocwen's decision to omit the term "unnecessary" from the billing statement.  This is

1   not a recognized RICO predicate act.  As a result, Vega failed to plead a necessary

2   element of her cause of action.  Because there is no predicate act, the Court does not

3   need to reach the other RICO elements.  Count II of her Complaint, a civil RICO

4   claim under 18 U.S.C. § 1962(c), is dismissed.  Because Vega does not have a cause

5   of action under § 1962(c), her civil RICO conspiracy claim under § 1962(d)—Count

6   III—must also be dismissed.  *See Turner v. Cook*, 362 F.3d 1219, 1231 (9th Cir. 2004)

7   (affirming dismissal of a § 1962(d) claim where a plaintiff failed to allege the

8   predicate § 1962(c) claim).

9            **3.      Count IV:  Rosenthal Act**

10           Vega's fourth cause of action alleges a violation of California's Rosenthal Act,

11  Cal. Civ. Code § 1788.   (Compl. ¶¶ 142–49.)   Vega correctly argues that the

12  Rosenthal Act incorporates by reference the federal Fair Debt Collection Practices Act

13  ("FDCPA"), 15 U.S.C. § 1692e, such that a violation of § 1692e is also a violation of

14  the Rosenthal Act.  Cal. Civ. Code § 1788.17.  (*See* Compl. ¶ 145.)  By virtue of

15  incorporation, the Rosenthal Act prohibits a debt collector from using "any false,

16  deceptive, or misleading representation or means in connection with the collection of

17  any debt."  15 U.S.C. § 1692e.  Vega's Rosenthal Act claim is stated as follows:

18  "[Ocwen] knowingly, affirmatively, and actively concealed and suppressed material

19  facts, namely the fact that [Ocwen] indiscriminately assess[ed] borrowers' accounts

20  for unnecessary default-related services."  (Compl. ¶ 147.)

21           "To evaluate claims under the Rosenthal Act, the Court must consider whether

22  the alleged communications from the debt collector would likely mislead the least

23  sophisticated debtor."  *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th

24  Cir. 2008).  "In assessing FDCPA liability, we are not concerned with mere technical

25  falsehoods that mislead no one, but instead with genuinely misleading statements that

26  may frustrate a consumer's ability to intelligently choose his or her response."

27  *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir. 2010).

28  / / /

Vega alleges that Ocwen made a deceptive representation by not telling her that the imposed fees were unnecessary.   The Court rejects this theory of liability under the Rosenthal Act.   The failure to concede liability in a billing statement does not make the billing statement "false, deceptive, or misleading," and there is no law anywhere to support this theory of liability.   Vega was not misled, as a matter of law, by her billing statement when Ocwen did not concede breach of contract liability.

As explained *supra*, every pending case involving property inspection fees includes allegations that the mortgage servicer concealed the fees on the billing statement.   *See, e.g., Ellis*, 950 F. Supp. 2d at 1068; *Stitt*, 942 F. Supp. 2d at 949; *Bias*, 942 F. Supp. 2d at 924; *Young*, 671 F. Supp. 2d at 1013; *Cirino*, No. 2:13-cv-08829, ECF No. 41.   There are no allegations of actual concealment here.

A U.S. District Court in Pennsylvania recently resolved an FDCPA claim nearly identical to Vega's claim.   In *Benner v. Bank of America, N.A.*, 917 F. Supp. 2d 338, 353 (E.D.P.A. 2013), the plaintiff argued "that Defendant's property inspection fees were not 'reasonable' foreclosure costs under Pennsylvania law, and therefore false representations in violation of § 1692e(2) of the FDCPA."   The *Benner* court first explained that property inspection fees are "not expressly forbidden by the FDCPA" and "the mortgage agreement permits Defendant to charge for property inspections." *Id.*   The court further explained that the "monthly mortgage statement directed Plaintiff to his loan documents for information on property inspections, and in those documents the right to inspect is clearly stated." *Id.* at 354.   The *Benner* court then concluded that "[t]here is nothing false or misleading about this statement" and "dismiss[ed] Plaintiff's claim that Defendant violated § 1692e(2)." *Id.*

Here, there are no allegations that Ocwen concealed the property inspection fees.   The only allegation is that Ocwen did not disclose to Vega that the inspection was "unnecessary." *Benner* rejected a theory of FDCPA liability nearly identical to the one here.   There are no allegations that Vega's monthly bill was labeled as something other than "property inspections" and Vega could have referred to her

mortgage agreement if she wanted further clarification about the nature of the property inspection fees.  The Court sees no reason to depart from the reasoning in *Benner* as it confirms the Court's decision to dismiss this claim.

The Court rejects Vega's reliance on "Fannie Mae's Family Servicing Guide." (Compl. ¶ 119.)  In her Complaint, Vega alleges that the Servicing Guide "details Fannie's Mae's [*sic*] expectation that every servicer will have in place clearly written policies regarding fee assessment . . . [and] states that charging a delinquent borrower's account for monthly property inspections generally would not be a permissible practice unless the servicer determines that the circumstances warrant multiple inspections."  (*Id.*)

As an initial matter, there are no allegations that Fannie Mae plays any role in this case.  Vega fails to even allege how the Servicing Guide would trump the agreed-upon terms in her mortgage agreement.  Furthermore, Courts are not receptive to the breach-of-servicing-guideline theory of liability.  Courts generally reject such claims on standing grounds.  *See, e.g.*, *McKenzie v. Wells Fargo Bank, N.A.*, 931 F. Supp. 2d 1028, 1044 (N.D. Cal. 2013) ("[T]he federal courts have uniformly concluded, to the extent that the [Fannie Mae and Freddie Mac] servicing guidelines can be read as creating enforceable contractual duties, that borrowers are neither parties nor third-party beneficiaries entitled to enforce the [Fannie Mae and Freddie Mac] servicing guidelines."); *Clark v. Lender Processing Servs., Inc.*, 949 F. Supp. 2d 763, 771 (N.D. Ohio 2013) ("Because Plaintiffs are not parties to the [pooling servicing agreements], they lack standing to assert any claim under the FDCPA or [state law]."); *Alexander v. Bank of Am., N.A.*, No. 2:13-cv-00067, 2014 WL 106349, *2–3 (N.D. Ga. Jan. 10, 2014) ("Plaintiff was not a party to the [pooling and servicing agreement] and thus 'do[es] not have standing to challenge any purported breach of the rights and obligations of it.'"); *Bank of N.Y. Mellon v. Sakala*, No. 11-cv-00618, 2012 WL 1424665, *5 (D. Haw. Apr. 24, 2012) ("Under these circumstances, courts have found that borrowers cannot assert a claim arising under the [pooling servicing agreement].")

(collecting cases).   As a result, an unassociated and seemingly random servicing guideline does not create the basis for all liability under the Rosenthal Act.

Vega has not stated a claim to relief that is plausible on its face, and therefore dismissal of Count IV pursuant to Rule 12(b)(6) is appropriate.

### 4.    Count V: Unjust Enrichment

Under California law, the elements of unjust enrichment are: (1) receipt of a benefit and (2) the unjust retention of the benefit at the expense of another.  *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008). Vega has not alleged any payment to Ocwen for the property inspection fees.   Therefore, Ocwen was not unjustly enriched at Vega's expense.   This claim is also dismissed pursuant to Rule 12(b)(6).

### 5.    Count VI:  Fraud

Vega's fraud claim is based on Ocwen's alleged failure to disclose.   In her Complaint, Vega explains her theory as follows:  "Plaintiff reasonably expected that Ocwen would comply with the disclosures set forth in the mortgage agreement . . . and as a result, Plaintiff relied on Ocwen's disclosures about the fees on their [*sic*] statements, reasonably believing the default-related service fees to be valid charges that were not unnecessary." (Compl. ¶ 160.)  Vega continues:  "Had the true nature of the fees been disclosed to Plaintiff . . . they would have been aware of the unnecessary fees, and Plaintiff would have disputed the charges and not paid them. . . . Ocwen omitted and concealed material facts . . . with knowledge of the effect of concealing of these material facts.  Ocwen knew that by misleading consumers, they would generate higher profits." (*Id.* ¶¶ 161–62.)

There are a host of problems with this legal theory of fraud.  First, this theory of fraud utilizes the same flawed approach the Court rejected in Vega's UCL, RICO, and Rosenthal Act causes of action.  Despite the clear language in the mortgage agreement which allows for property inspection fees, and despite the itemized billing statements that specified the date and amount of each property inspection, Vega believes a fraud

was committed because her billing statement did not tell her that the fees were "unnecessary" and "indiscriminate."   Vega believes that Ocwen should be liable for fraud because it did not admit to breach of contract liability in the billing statement. Similar to the other causes of action in this cases, there is no precedent to support this theory of liability.

Second, a fraud claim requires allegations of reliance and damages.  *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) ("The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity ('or scienter'); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage."). Vega claims that had Ocwen told her that the property inspections were "unnecessary" then "Plaintiff would have disputed the charges and not paid them."  (Compl. ¶ 161.) Vega did not pay anything.  She also did not rely on any alleged misrepresentation in suffering no damage.  Therefore, the reliance and damages elements are missing from her claim.

Third, Ocwen seeks dismissal of Vega's fraud claim on grounds that the economic loss rule applies.  (Mot. at 12.)  Under California law, "a party alleging fraud or deceit in connection with a contract must establish tortious conduct independent of a breach of the contract itself, that is, violation of 'some independent duty arising from tort law.'"  *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1130 (2012) (quoting *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004)).  According to Vega, the independent tort occurred when Ocwen "knowingly, affirmatively, and actively concealed the true character, quality, and nature of their indiscriminate assessment of unnecessary fees against borrowers' accounts."  (Opp. Br. at 11–12.)

The Court does not see this case as anything other than a mere contract dispute. As explained *supra*, Ocwen can avoid all liability if a fact-finder determines that automated monthly inspections are not a breach of the mortgage agreement.  Vega

26

argues that the district court in *Young* rejected an identical economic loss rule argument.  (Opp. Br. at 11.)  In *Young*, the property inspection fees were listed on the monthly billing statements as "other charges."  *Young*, 671 F. Supp. 2d at 1013.  In rejecting the economic loss rule argument, the *Young* court explained that "the manner in which the charges were presented in the statements, under the generalized heading 'other fees,' supports an inference that Wells Fargo sought to conceal the nature of the fees."  *Id.* at 1038.

Here, there are no such allegations of similar concealment and the Court cannot infer improper conduct on the sole basis that the term "unnecessary" was not written on the billing statement.  For Vega's concealment theory of fraud to work, the Court must first decide whether there is a breach of contract.  Because this claim is dependent on the breach, and because Ocwen may avoid all liability based on the terms of the mortgage agreement, no independent tortious conduct exists.  For the numerous reasons stated above, the Court dismisses Vega's cause of action for fraud.

## V.   CONCLUSION

The Court concludes that all six of Vega's claims fail as a matter of law.  The Court also concludes that Vega's Complaint is inherently flawed because it argues terms not in her mortgage agreement.  Thus, Vega failed to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  The Court hereby **GRANTS** Defendants' Motion to Dismiss.  (ECF No. 29.)

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

It is possible that Vega could amend her Complaint to bring a claim for breach of contract.  In light of the "extreme liberality" of the amending rules, *see Owens v. Kaiser Found. Health Plan*, 244 F.3d 708, 712 (9th Cir. 2001), the Court must dismiss the Complaint **WITHOUT PREJUDICE**.  Vega has ten days from the date of this order to file an amended complaint.

**IT IS SO ORDERED.**

March 24, 2015

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**